**Yasuko ISHIKAWA, Plaintiff–Appellee,**

v.

**DELTA AIRLINES, INC., a Georgia Corporation, Defendant,**

**and**

**LabOne, Inc., a Delaware Corporation, Defendant–Appellant.**

No. 01–35863.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 2003.

Filed Sept. 12, 2003.

waived, where there was no evidence the defendant knew of his right to object, but did not object for some tactical reason).

John J. Weber, O'Flaherty, Cross, Martinez & Ovando, LLP, Anaheim, CA, for the Appellant.

Mark McDougal and Linda K. Williams (briefed), Kafoury & McDougal, Portland, OR, for the Appellee.

Before: KLEINFELD, McKEOWN, Circuit Judges, and BREYER, District Judge.*

KLEINFELD, Circuit Judge.

We decide whether an airlines employee has a state common law tort action against a negligent urine testing laboratory.

## Facts

Yasuko Ishikawa, a Delta flight attendant, got fired for failing a drug-detection urine test. But the test was negligently performed, and the result had no validity whatsoever. Delta rehired her, and paid her the $68,920 of income she had lost. She sued LabOne, the urine test laboratory to which Delta had sent her urine, for negligence. The jury verdict establishes that LabOne negligently analyzed and reported her results, causing $68,000 of economic damages, $332,000 of noneconomic damages. The jury awarded no punitive damages.

While she was flying from Japan to Portland, Oregon, on September 20, 1999, Ishikawa was told she would be required to take a random drug test when the plane landed. The flight took nine hours, and Ishikawa drank several liters of water and tea during the flight. When the plane landed, she provided the urine sample.

There have to be safeguards to assure the accuracy of urine tests. Someone who has ingested drugs could otherwise substitute someone else's urine, that of a cooperative horse, or colored water, to generate a negative result. One method of testing for a "substituted" sample is to ensure that the urine be neither too watery nor too syrupy to be consistent with human urine, and that it contain an appropriate amount of creatinine, a protein manufactured by the body and ordinarily found in urine. At the time of Ishikawa's test, two Department of Health and Human Services Program Documents[1] described the proper procedure for testing for substituted urine. A sample, according to the Program Documents, is properly labeled "substituted" if the creatinine concentration is less than or equal to 5 mg/dL *and* the specific gravity is less than or equal to 1.001 or greater than or equal to 1.020.[2] Because her sample was reported as "substituted," Delta treated the result as equivalent to an employee refusal to submit to a drug test, and fired Ishikawa.

LabOne's report said that Ishikawa's sample's specific gravity was 1.001 and its creatinine 5 mg/dL. Thus it reported to Delta "specimen substituted: not consistent with normal human urine." It was not sufficiently heavier than water and had too little creatinine, according to the Program Documents (which required failure of both the creatinine and the specific gravity criteria for her urine to be considered "substituted"). Fortunately, the sample Ishikawa provided had been split, and one part preserved. During the litigation, the judge granted an order requiring that the second half of the sample be tested by

---

* The Honorable Charles R. Breyer, District Judge for the Northern District of California, sitting by designation.

1. Department of Health and Human Services Program Document 035 (Sept. 28, 1998) and Program Document 37 (July 28, 1999).

2. These same standards have now been incorporated into the current federal regulations, though the regulation had not been promulgated when Ishikawa's urine was tested. *See* 49 C.F.R. Subtitle A § 40.93.

another federally approved laboratory. This test, on the same urine from when she got off the plane from Japan, showed a creatinine level of 5.3 mg/dL and specific gravity of 1.002. That made it a "dilute specimen" but not a "substituted specimen."

The substantive issue in this litigation was whether LabOne negligently tested and reported on Ishikawa's urine. Some testing defects are subtle, like the Bayes' Theorem problem we discussed in *Gonzalez v. Metropolitan Transportation Authority*.[3] The Bayes' Theorem problem is that if a test gives false positives 1% of the time, and the tested population has genuinely "dirty" urine in one case out of ten, then out of a thousand tests, 100 of the "positive" reports will be true and ten false; but if the tested population has genuinely "dirty" urine in only one case out of a thousand, then the very same test performed with the very same care will yield ten false positives for every true positive.[4] Some errors are simple, like putting someone else's identification on the sample container. LabOne's errors were down at the simple end of the spectrum, to the point of being crude.

Among the many things LabOne was doing wrong was truncating or rounding the creatinine result to an integer. Its machine was programmed to give only the integer (nothing past the decimal point). There was conflicting evidence about whether the machine truncated or rounded, but it does not matter to the result in this case, as both methods were materially wrong. Truncating means cutting off the decimal, so that even a 5.9 creatinine result would be reported as only 5. A 5 is "substituted," a 5.9 is not. Rounding to the nearest integer would treat a 5.9 as a 6, but would treat a 5.4, which is not "substituted," as a 5, which is. Since the test of the other half of Ishikawa's split sample yielded a 5.3 creatinine level, whether LabOne rounded or truncated is immaterial to her case. What is material is that her passing result of 5.3 was converted to a failing result of 5.

We need not decide whether the Program Documents giving the criteria above were binding as a matter of law on LabOne. Ishikawa did not sue LabOne for violation of federal criteria, and this is not an administrative law case in which LabOne resists some administrative action based on violation of the Program Documents. Ishikawa sued simply for the state common law tort of negligence. The trial judge instructed the jury that it could "consider" the Program Documents in deciding whether LabOne was negligent, but did not instruct the jury to consider some sort of federal claim based on violation of the Program Documents. The case went to the jury as a simple state common law claim. The court instructed that the "plaintiff alleges that LabOne was negligent in analyzing and reporting the results of her urine sample" in six different ways. The jury found LabOne was negligent, and awarded $400,000 in damages.

LabOne appeals.

## Analysis

LabOne's principal argument on appeal is that Ishikawa was not entitled to sue it at all, because the federal statute and regulations do not provide for a private right of action, and that her state common law action was preempted. These arguments were fully preserved by motions to dismiss and for summary judgment. The district court rejected them and so do we.

---

**3.** 174 F.3d 1016 (9th Cir.1999).

**4.** *Id.* at 1023.

## A. Preemption.

The argument that the federal scheme does not create a private right of action is a red herring. Ishikawa did not pursue some supposed private right of action under the federal scheme. LabOne argues that the Second and Sixth Circuits have held that there is no private right of action,[5] and that we should too. This case affords no occasion to reach the question, because no such claim was made.

LabOne's primary argument, however, is that the Omnibus Transportation Employee Testing Act of 1991 [6] and the regulations promulgated by the FAA pursuant to it preempt the state common law, excluding the possibility of a state-law tort action. We took up a similar question in *Keams v. Tempe Technical Institute,*[7] where we were asked to decide whether an elaborate federal scheme preempted a state common law tort action for negligence or negligent misrepresentation. *Keams's* holding that the negligence claims were not pre-empted is instructive here.

■ There is no express federal preemption by the statute. On the contrary. The statute contains a preemption clause expressly limited to "inconsistent" state law:

(a) **Effect on State and local government laws, regulations, standards, or orders.** A State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order that is *inconsistent* with regulations prescribed under this chapter. However, a regulation prescribed under this chapter does not preempt a State crimi-

nal law that imposes sanctions for reckless conduct leading to loss of life, injury, or damage to property.[8]

As the first sentence makes explicit, a party claiming preemption under this statute has the burden of demonstrating that the putatively preempted law is "inconsistent" with the federal regulations. LabOne argues that we ought not to let the states govern willy nilly and that state tort law *could* be inconsistent with federal regulations. LabOne, however, makes no attempt to show that anything about the state law applied in this case actually *was* inconsistent. And we cannot see how the duty the state common law imposed, that LabOne test urine and report the results with due care, could be inconsistent with the federal guidelines, which require the same thing with more specificity. It is not as though the state law had one creatinine standard, the federal program another. The district court invited and the plaintiff urged that the jury use the federal requirements to evaluate whether LabOne performed its duties with due care.

Conceivably LabOne might argue—it doesn't—that the second sentence of the statute, expressly *not* preempting described state criminal law, carries a negative pregnant that other state law is preempted. Doubtless that argument was abjured because of the presumption against preemption. *Cipollone v. Liggett Group, Inc.*[9] held that there is "a presumption against the pre-emption of state police power regulations," and applied this presumption to state common law tort claims.[10] It is the first sentence of the

**5.** *Drake v. Delta Air Lines,* 147 F.3d 169, 170–71 (2d Cir.1998); *Parry v. Mohawk Motors of Michigan,* 236 F.3d 299, 308–09 (6th Cir. 2000).

**6.** Pub.L. 102–143.

**7.** 39 F.3d 222 (9th Cir.1994).

**8.** 49 U.S.C. § 45106(a) (emphasis added).

**9.** 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

**10.** *Id.* at 518, 112 S.Ct. 2608.

statute that gets an *expressio unius est exclusio alterius* interpretation under *Cipollone*, because "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." [11]

The federal regulations implementing the federal drug testing program expressly preserve rather than preempt employees' common law claims. The FAA regulation pursuant to which Ishikawa's drug test took place says that the drug testing program has to comply with a broader set of drug testing regulations.[12] And that broader and controlling set of regulations [13] expressly provides that "[t]he employee may not be required to waive liability with respect to negligence on the part of any person participating in the collection, handling, or analysis of the specimen." [14] Negligence is a state common law tort, and it would make no sense for the regulation to prohibit requiring the employee to waive negligence claims if those claims were preempted and could not be made. This regulation prohibiting required waivers of negligence claims implies that such claims exist and are not preempted.

The regulations do contain an express preemption provision more specifically drawn than the statutory preemption clause: "The issuance of 14 CFR parts 65, 121, and 135 by the FAA preempts any state or local law, rule, regulation, order, or standard covering the subject matter of 14 CFR parts 65, 121, and 135, including but not limited to, drug testing of aviation personnel performing safety-sensitive functions." [15] We are compelled to read this preemption language as too narrow to preempt state common law negligence claims, because of the coequal regulation prohibiting the waiver of such claims. In addition, LabOne has failed to demonstrate that the state common law negligence claims "cover[ ] the subject matter of 14 CFR parts 65, 121, and 135." In the absence of such a showing, we cannot conclude that Ishikawa's claims are pre-empted under this regulation.

As a general matter, implied preemption can exist even when express preemption does not. But ordinarily "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when the provision provides a reliable indicium of congressional intent with respect to state authority ... there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation." [16] As in *Keams*, the "express provisions for preemption of some state laws," the inconsistent ones, "imply that Congress intentionally did not preempt state law generally." [17]

There are two varieties of implied preemption. Congress can implicitly preempt state law by "occcupy[ing] the entire field, leaving no room for the operation of state law." [18] State law can also be implicitly preempted if it conflicts with federal law, either through such a conflict that compliance with both is impossible,[19] or where the state law is "an obstacle to the accom-

11. *Id.* at 517, 112 S.Ct. 2608.

12. 14 C.F.R. Pt. 121, App. I (2000).

13. 49 C.F.R. Pt. 40.

14. 49 C.F.R. Subtitle A § 40.25(f)(22)(ii) (1998).

15. 14 C.F.R. Part 121, Appendix I, XI.

16. *Cipollone,* 505 U.S. at 517, 112 S.Ct. 2608 (internal quotation and citation omitted).

17. *Keams,* 39 F.3d at 225.

18. *Id.*

19. *Id.* at 226.

plishment and execution of the full purposes and objectives of Congress." [20]

*Silkwood v. Kerr–McGee Corp.*[21] supports our analysis in this case. In *Silkwood*, a nuclear power plant employee was held to be entitled to pursue a state common law tort claim for compensatory and punitive damages when she was contaminated by plutonium. Despite a previous determination that Congress *had* generally occupied the field, at least insofar as standards for managing nuclear facilities was concerned,[22] the Court held that Silkwood's estate was entitled to pursue the state common law tort action for compensatory and punitive damages. As in the case at bar, it was argued that the statutory remedy of regulatory action against the plant operator precluded a tort remedy, or at least a punitive damages remedy. But the court said Congressional "silence" about "recourse for those injured" implied the contrary, that tort remedies were *not* preempted, because "[p]aying both federal fines and state-imposed punitive damages for the same incident would not appear to be physically impossible" and would not "frustrate any purpose of the federal remedial scheme." [23] The *Silkwood* holding applies to the case at bar. Despite the sensitivity and federal concern with urine testing, it is no more delicate and important than federal regulation of nuclear facilities, and if a state common law tort action is permissible for the latter, *a fortiori* it is also permissible for the former. The common law duty to exercise reasonable care to avoid harming people by negligence applies similarly to both.

There is also, generally, implied preemption where "compliance with both state and federal law would be impossible," or where state law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." [24] Neither of those kinds of implied preemption can be inferred in the face of the express language preempting only "inconsistent" state law and the regulatory language prohibiting waivers of negligence claims. If state law is not inconsistent, it cannot be impossible to comply with, and it cannot obstruct implementation of federal law, particularly where the regulations protect precisely such state law claims as the plaintiff brought.

## B. Damages.

The jury verdict awarded $68,000 in "economic" damages. The parties agree that, as presented to the jury, this amounts to an award for the compensation and benefits that Delta did not pay Ishikawa after it fired her on account of LabOne's negligent test report. After it re-hired Ishikawa, Delta paid her $68,920 as compensation for the lost pay and benefits. Evidently the jury truncated.

LabOne argues that since Ishikawa had already been compensated by Delta for this loss, she should not have been awarded compensation from LabOne. But they concede that the common law collateral source rule would bar that interpretation. Under the collateral source rule, the tortfeasor is not entitled to be relieved of the consequences of its tort by some third party's compensation to the victim. The

**20.** *Id.* (internal quotation and citation omitted).

**21.** 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).

**22.** *Pac. Gas and Elec. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) ("[T]he federal government has occupied the entire field of nuclear safety concerns").

**23.** *Id.* at 251–57.

**24.** *Kearns*, 39 F.3d at 226.

record does not show whether, as is common in such cases, Delta has some arrangement with Ishikawa whereby she must reimburse Delta out of her award. Medical insurers, for example, commonly are subrogated to victim's rights against tortfeasors to the extent of the insurers' payments, and third parties that also bear some responsibility for harm sometimes negotiate settlement agreements whereby if the victim recovers for the same harm from another, some reimbursement arrangement will be compelled. These unknown arrangements are all irrelevant to the legal question, whether LabOne is entitled to pay $68,000 less than the damage it caused because Delta already paid that part.

■ LabOne's argument is based entirely on an Oregon statute that limits the common law collateral source rule. The statute provides for deduction from a judgment of collateral source benefits "when a party is awarded damages for bodily injury or death" and "received benefits for the injury or death other than from the party who is to pay the damages." [25] LabOne makes no argument that Ishikawa received an award "for bodily injury or death," only that the statute ought to be read more broadly than its words. Conceivably one could argue that the $332,000 for "non-economic damages" was for mental distress amounting to a kind of bodily injury (though LabOne does not make this argument), but there is no way to argue that Ishikawa "received benefits" from Delta for bodily injury or death. And without benefits from Delta "for injury or death," the statute has no application. There is no Oregon authority for a broader reading in

contravention of the words of the statute. The $68,000 awarded by the jury and the $68,920 from Delta was for lost pay and benefits. Thus the statute does not apply.

AFFIRMED.

---

25. Or.Rev.Stat. § 18.580 (2003) ("In a civil action, *when a party is awarded damages for bodily injury or death* of a person which are to be paid by another party to the action, and the party awarded damages or person injured or deceased *received benefits for the injury or death other than from the party who is to pay the damages,* the court may deduct from the amount of damages awarded, before the entry of a judgment, the total amount of those collateral benefits.") (emphasis added).