# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

METROPHONES
TELECOMMUNICATIONS, INC., a
Washington corporation,
        *Plaintiff-counter-*
        *defendant-Appellee,*

        v.

GLOBAL CROSSING
TELECOMMUNICATIONS, INC., a
Michigan corporation,
        *Defendant-counter-*
        *claimant-Appellant,*

        and

UNIDENTIFIED COMPANIES I THROUGH
X,
        *Defendants.*

No. 04-35287

D.C. No.
CV-03-00694

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued January 12, 2005, and
Resubmitted August 31, 2005
Seattle, Washington

Filed September 8, 2005

Before: Mary M. Schroeder, Chief Judge, and
Alfred T. Goodwin and Susan P. Graber, Circuit Judges.

Opinion by Judge Graber

12743

## COUNSEL

Michael J. Shortley, III, Global Crossing North America, Inc., Pittsford, New York, and Daniel M. Waggoner, Davis Wright Tremaine LLP, Seattle, Washington, for the defendant-counter-claimant-appellant.

David J. Russell, Keller Rohrback L.L.P., Seattle, Washington, for the plaintiff-counter-defendant- appellee.

Joel Marcus, Federal Communications Commission, Washington, D.C., for the amicus curiae.

**OPINION**

GRABER, Circuit Judge:

We again are asked to decide whether a provider of payphone services may sue a long distance carrier to recover compensation that federal regulations, 47 C.F.R. §§ 64.1300-.1340, obligate the carrier to pay. We faced that question once before, in *Greene v. Sprint Communications Co.*, 340 F.3d 1047, 1050-51 (9th Cir. 2003), *cert. denied*, 541 U.S. 988 (2004), and answered "no." This time, the circumstances have changed materially: since our decision in *Greene*, which was made without the participation of the Federal Communications Commission ("Commission" or "FCC"), the Commission has interpreted a provision of the Communications Act that we did *not* address explicitly in *Greene*, 47 U.S.C. § 201(b), to allow such actions. As we explain below, we defer to the Commission's reasonable, authoritative interpretation of that statute. *See, e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2702-12 (2005) ("*Brand X*") (deferring to the FCC's interpretation of a statute).

Consequently, we affirm the district court's decision to allow Plaintiff Metrophones Telecommunications, Inc., a payphone service provider, to go forward with its claim under § 201(b) against Defendant Global Crossing Telecommunications, Inc., a long distance carrier. We also hold that Plaintiff may pursue two of its three state law claims, because they are not preempted by 47 U.S.C. § 276(c). We reverse, however, the district court's decision to allow Plaintiff to pursue claims under 47 U.S.C. § 416(c) and under a third state-law theory.

## I.  BACKGROUND

A.  *Statutory and Regulatory Background*

Before 1996, payphone service providers ("PSPs") were largely uncompensated for "dial-around" coinless calls—calls in which the caller uses an access code or a "1-800" number to place calls through a long distance carrier other than the carrier with which the PSP has a contract. *Am. Pub. Commc'ns Council v. FCC*, 215 F.3d 51, 53 (D.C. Cir. 2000). As of 1990, PSPs were prohibited by statute from blocking such dial-around calls, *Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 559 (D.C. Cir. 1997) (per curiam), but were unable to secure payment for them. Therefore, in the Telecommunications Act of 1996, Pub. L. No. 104-104, 100 Stat. 5,[1] Congress directed the Commission to enact regulations establishing "a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone." 47 U.S.C. § 276(b)(1)(A).

The Commission then adopted rules making particular carriers responsible for compensating PSPs for dial-around calls. 47 C.F.R. §§ 64.1300-.1340; *see also Sprint Corp. v. FCC*, 315 F.3d 369, 371-73 (D.C. Cir. 2003) (describing the development of the rules); *Pay Tel. Reclassification & Comp. Provisions of Telecommc'ns Act of 1996*, 18 F.C.C.R. 19,975 (2003) ("*2003 Payphone Order*") (adopting final rules for fair compensation of PSPs). The rules require carriers to pay PSPs on a per-call basis at a rate agreed upon by the parties, 47 C.F.R. § 64.1300(b), and set default per-call rates that are

---

[1]Congress directed that the Telecommunications Act of 1996 be inserted into the Communications Act of 1934. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 377 (1999). In this opinion, we use "Communications Act" to refer to the entire statute—i.e., Title 47, Chapter 5—and "Telecommunications Act" when referring specifically to the 1996 Act or to portions of the statute added in 1996.

mandatory in the absence of such an agreement, *id.* § 64.1300(c), (d). The rules also set forth detailed compensation procedures and reporting requirements, which the parties may modify by agreement. *Id.* § 64.1310.

B.   *Procedural History*

Plaintiff filed this action in district court alleging that Defendant had failed to pay the full amount owed for calls placed from Plaintiff's payphones. Originally, Plaintiff brought its action under 47 U.S.C. § 276—the statute by which Congress had directed the Commission to enact regulations to fairly compensate PSPs. However, soon after Plaintiff filed its action, this court held that § 276 provides no private right of action—express or implied—to recover compensation for payphone calls. *Greene*, 340 F.3d at 1053.

In the wake of *Greene*, Defendant moved for judgment on the pleadings as to Plaintiff's federal claim. The district court agreed that *Greene* foreclosed Plaintiff's original claim under § 276, but permitted Plaintiff to amend its complaint to assert federal claims under 47 U.S.C. §§ 201(b) and 416(c), provisions dealing with "unjust and unreasonable" practices of carriers and the duty to comply with FCC orders, respectively. The court rejected Defendant's argument that those amendments would be futile because they would not survive a motion to dismiss.

Defendant also moved for judgment on the pleadings on Plaintiff's state law claim for "quantum meruit," arguing that the claim was preempted by 47 U.S.C. § 276(c), which expressly preempts state laws that are inconsistent with the federal regulations. The district court denied Defendant's motion, concluding that the quantum meruit claim was consistent with the federal regulations. For the same reason, the court allowed Plaintiff to add two additional state law claims for breach of implied contract and negligence.

The district court granted Defendant's motion requesting an interlocutory appeal, 28 U.S.C. § 1292(b), and we agreed to allow the appeal.

## II.   STANDARDS OF REVIEW

In an interlocutory appeal, we review de novo the district court's denial of a motion for judgment on the pleadings. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986) (reviewing de novo the denial of a motion to dismiss for failure to state a claim); *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir.) (reviewing de novo a dismissal on the pleadings), *cert. denied*, 125 S. Ct. 498 (2004). The district court's interpretation of a statute is reviewed de novo, *SEC v. McCarthy*, 322 F.3d 650, 654 (9th Cir. 2003), as are its decisions regarding preemption, *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 927 (9th Cir. 2002).

We review for abuse of discretion the district court's decision to permit amendment of a complaint. *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 853 (9th Cir.), *amended by* 312 F.3d 416 (9th Cir. 2002). An error of law is one form of an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996).

## III.   DISCUSSION

A.   *Plaintiff may pursue compensation in a private action under the FCC's reasonable, authoritative interpretation of 47 U.S.C. § 201(b).*

1.   *Greene did not address 47 U.S.C. § 201(b).*

We recognized in *Greene* that any person who suffers damages as a result of a common carrier's violation of a "provision[ ] of this chapter"—that is, of the Communications Act, 47 United States Code, Chapter 5—may seek recovery of

those damages in federal court under 47 U.S.C. §§ 206 and 207.[2] *Greene*, 340 F.3d at 1050 & n.2. Nonetheless, we held that a common carrier's failure to pay compensation for payphone calls does not violate 47 U.S.C. § 276 and therefore does not give rise to a claim under §§ 206 and 207. *Id.* at 1050-51. We reasoned that, although the regulations enacted *pursuant to* § 276 require carriers to pay PSPs, the *statute itself* merely requires the Commission to adopt regulations to ensure fair compensation for PSPs. *See id.* Because a claim under §§ 206 and 207 requires violation of a statute, and because a carrier does not violate § 276 directly when it fails to pay PSPs, "there is no violation of the Act to be remedied through the private right of action afforded by §§ 206 and 207." *Id.* at 1052.[3] The payphone regulations alone, we held, could not create an enforceable obligation where none existed in the statute. *Id.* at 1051 (citing *Alexander v. Sandoval*, 532 U.S. 275, 284-89 (2001)).

In *Greene*, we were not asked to decide whether a carrier's failure to compensate a PSP would violate provisions of the Communications Act *other than* § 276, nor did we give

---

[2]Title 47 U.S.C. § 206 provides, in relevant part:

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter . . . .

Section 207, in turn, gives injured parties the right either to make complaint before the Commission *or* to bring an action in district court. 47 U.S.C. § 207.

[3]The plaintiffs in *Greene* sought, in the alternative, to enforce § 276 through an implied cause of action under *Cort v. Ash*, 422 U.S. 66 (1975). The *Greene* panel's decision not to imply a private right of action to enforce the regulations, 340 F.3d at 1052-53, is not controlling here because Plaintiff asserts only the statutory cause of action provided for in §§ 206 and 207.

explicit consideration to any other provision of that Act. Nonetheless, several of our statements suggest that our decision foreclosed any recovery of payphone compensation under federal law. For example, we said:

> There is no private right of action for the relief that PSPs seek, to recover damages for [a carrier's] alleged failure to pay compensation for dial-around calls as required by FCC regulations promulgated pursuant to § 276 of the Telecommunications Act.

*Id.* at 1053; *see also id.* at 1052 (stating that failure to pay a PSP causes "no violation of the Act"). Thus, the central question briefed by the parties in the present appeal is whether the broad statements in *Greene* preclude an action to enforce two different sections of the Act—47 U.S.C. §§ 201(b) and 416(c) —that we did not address in *Greene*. We turn first to § 201(b) and conclude that, in view of the FCC's reasonable, authoritative interpretation of § 201(b), *Greene* does not prevent Plaintiff from bringing an action under that section.

2.  *The FCC's interpretation of § 201(b) is entitled to deference.*

**[1]** Section 201 requires common carriers to furnish "communication service upon reasonable request therefor," 47 U.S.C. § 201(a), and further states:

> All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . .

*Id.* § 201(b). Plaintiff asserts that Defendant's failure to pay it proper compensation for dial-around calls violates § 201(b) because it is a "practice[ ] . . . in connection with . . . commu-

nication service" that is "unjust or unreasonable." Significantly, Plaintiff's interpretation of the statute is shared by the Commission, which stated in its *2003 Payphone Order* that

> [a] failure to pay in accordance with the Commission's payphone rules . . . constitutes . . . an unjust and unreasonable practice in violation of section 201(b) of the Act.

18 F.C.C.R. at 19,990, ¶ 32; *see also APCC Servs., Inc.*, 20 F.C.C.R. 2073, 2085, ¶ 26 (2005) ("[A carrier's] failure to pay payphone compensation to [PSPs] violated section 64.1300(c) of the rules *and thus section[ ] . . . 201(b) of the Act*." (emphasis added)).[4] The Commission also cited § 201, in addition to § 276 and several other sections, as the authority for its initial enactment of the payphone regulations in 1999. *See Implementation of Pay Tel. Reclassification & Comp. Provisions of Telecomms. Act of 1996*, 14 F.C.C.R. 2545, 2648, ¶ 232 (1999). Under the FCC's interpretation, the failure to pay compensation to PSPs violates § 201(b)'s prohibition of unjust or unreasonable practices and, therefore, is actionable in federal district court pursuant to §§ 206 and 207.

> a. *Our implicit holding in* Greene *cannot trump the FCC's interpretation, if that interpretation is entitled to* Chevron *deference*.

**[2]** Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984), "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the

---

[4]In both decisions, the Commission also stated that a failure to pay in accordance with the regulations violates § 276. *2003 Payphone Order*, 18 F.C.C.R. at 19,990, ¶ 32; *APCC Servs.*, 20 F.C.C.R. at 2085, ¶ 26. We need not address what effect, if any, this interpretation of § 276 has on our decision in *Greene*, because Plaintiff has not appealed the dismissal of its claim under § 276.

statutory gap in reasonable fashion." *Brand X*, 125 S. Ct. at 2699. If we owe *Chevron* deference to the Commission's interpretation of § 201(b), then our own prior, contrary interpretation of the statute can trump the agency's construction *only* if our decision held that its "construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 2700.

After *Brand X*, there can be no doubt that *Greene* does not prevent us from affording deference to the FCC's interpretation of § 201(b), if deference is otherwise due. We did not mention § 201(b) in *Greene* and thus could not have offered an interpretation that "follows from the unambiguous terms" of the relevant statute, *Brand X*, 125 S. Ct. at 2700. Thus, even if Defendant is correct that *Greene*'s holding should be interpreted to have covered § 201(b) implicitly, that implicit holding would be insufficient to trump an agency construction to which we owe deference. But the question remains: do we owe deference to the FCC's interpretation of § 201(b)?

### b. *The* Chevron *framework applies.*

**[3]** An administrative interpretation "qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). In *Brand X*, the Supreme Court afforded *Chevron* deference to an interpretation contained in a declaratory ruling of the FCC. *See* 125 S. Ct. at 2699 (holding that, because the FCC is authorized to promulgate binding legal rules and it "issued the order under review in the exercise of that authority," its interpretation of the Communications Act was entitled to *Chevron* deference).

We see no reason to treat the interpretation of § 201(b) in the *2003 Payphone Order* differently, despite Defendant's

argument that the interpretation is entitled to no deference because of its brevity. We rejected a similar argument in *Pacific Bell v. Cook Telecom, Inc.*, 197 F.3d 1236, 1242 (9th Cir. 1999): "Although the FCC's statements are brief and lack elaborate analysis, those statements deliberately and unambiguously single out paging providers for special notice." We explained that the FCC order contained "a relatively detailed and thorough attempt to explain the FCC's decisions concerning a very difficult statute" and that the statements did not "appear to have been made in anticipation of any particular litigation." *Id.*

Similarly, here, the statement in the *2003 Payphone Order* arose in the context of a complex decision about the operation of the whole system of payphone regulation. In context, it is apparent that the Commission considered the ability of PSPs to recover compensation for dial-around calls in private actions to be integral to the proper functioning of the payphone compensation system.

Some background is necessary to understand why this is so. The Commission has reversed positions several times on the issue of *which* carrier should pay the PSP when more than one carrier handles a single call. *See generally 2003 Payphone Order*, 18 F.C.C.R. at 19,977-83, ¶¶ 5-17. For example, a call may be carried from the payphone by an interexchange carrier, but completed to the recipient of the call by a switch-based reseller. In one phase of the development of the rules, interexchange carriers had to pay PSPs and then seek repayment from the switch-based reseller that completed the call. *Id.* at 19,981, ¶ 15; *id.* at 19,984, ¶ 20. However, in the final rules adopted in the 2003 Payphone Order, the Commission ordered switch-based resellers to pay PSPs directly. *Id.* at 19,986, ¶ 24.

PSPs opposed that final decision because it is easier for them to collect payment from only one entity (i.e., the interexchange carriers). The Commission rejected the PSPs' position

in part because the PSPs could recover damages from delinquent carriers in private actions:

> To the extent that [the PSPs'] argument is based on ease in collecting owed debts, the D.C. Circuit . . . found that the PSPs had remedies to recover this debt from the delinquent carriers. A failure to pay in accordance with the Commission's payphone rules, such as the rules expressly requiring such payment that we adopt today, constitutes both a violation of section 276 and an unjust and unreasonable practice in violation of section 201(b) of the Act.

*Id.* at 19,990, ¶ 32 (footnote omitted).[5] In short, in adopting the final rules in the *2003 Payphone Order*, the Commission relied on the availability of actions for damages under §§ 206 and 207.

[4] Because it is apparent that the Commission's interpretation of § 201(b) was connected with the broader reasoning that led to its adoption of the final rules, we find no reason to think that the interpretation of § 201(b) advanced in the *2003*

---

[5]The Commission was referring to a D.C. Circuit decision in which the court upheld the Commission's determination of the cost per payphone call. *See Am. Pub. Comm'cns Council v. FCC*, 215 F.3d 51, 56 (D.C. Cir. 2000). The court there reasoned that it was reasonable to exclude uncollected debt from the per-call cost because, "[a]s intervenor long distance carriers remind us, the '[f]ailure to pay the required compensation is a violation of FCC rules for which the carrier is subject to damages as well as fines and penalties.' *See* 47 U.S.C. §§ 206-08, 501-03 (1994)." *Id.*

The D.C. Circuit since has held that private actions, in fact, are not available under the Act. *APCC Servs., Inc. v. Sprint Commc'ns Co.*, No. 04-7034, 2005 WL 1512837, at *5-*10 (D.C. Cir. June 28, 2005) (per curiam). For the reasons that we articulate, we disagree with the majority's opinion in that case and, instead, we adopt the position of the dissenting judge: that "the Commission acted [ ]reasonably when it deemed a common carrier's failure to pay just and reasonable compensation an unjust and unreasonable practice." *Id.* at *15 (Ginsburg, J., dissenting in part and from the judgment).

*Payphone Order*, and supplemented by the Commission's amicus briefs in this case, is not the "fair and considered judgment" of the agency. *See Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 563 n.7 (9th Cir. 2002) (noting that the fact that an agency's interpretation of a statute that it administers "comes to us in the form of an *amicus* brief does not make it 'unworthy of deference' " (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997))). Thus, we will apply the *Chevron* framework to the FCC's interpretation of § 201(b).

    c.   *The FCC's interpretation of § 201(b) is a reasonable construction of an ambiguous statutory provision.*

**[5]** Under *Chevron*'s two-step analysis, we first must determine whether the statute makes Congress' intent clear; if so, we must "give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If not, and the statute is ambiguous as to the precise question at issue, "we defer at step two to the agency's interpretation so long as the construction is 'a reasonable policy choice for the agency to make.' " *Brand X*, 125 S. Ct. at 2702 (quoting *Chevron*, 467 U.S. at 845).

**[6]** We conclude that the text of § 201(b) does not unambiguously answer the precise question at issue here: whether the failure to pay a PSP is a "practice[ ] . . . in connection with . . . communication service" that is "unjust or unreasonable." In determining whether Congress clearly expressed its intent with regard to that question, we must consider § 201(b) in its statutory context. *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060-61 (9th Cir. 2003) (en banc).

**[7]** "Because 'just,' 'unjust,' 'reasonable,' and 'unreasonable' are ambiguous statutory terms," courts normally owe "substantial deference to the interpretation the Commission accords them." *See Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 204 (D.C. Cir. 1994). The statutory context does not convince us otherwise. The portion of § 201(b) at issue here

is among the core original provisions of the Communications Act of 1934, which required telecommunications carriers to file with the Commission "a list of tariffs, or 'schedules,' showing 'all charges . . . and . . . the classifications, practices, and regulations affecting such charges.' " *Ting v. AT&T*, 319 F.3d 1126, 1130 (9th Cir.) (quoting 47 U.S.C. § 203(a)), *cert. denied*, 540 U.S. 811 (2003).[6] The Commission may initiate hearings at which carriers must defend their tariffs, 47 U.S.C. § 204; after such hearings, the Commission may "determine and prescribe what will be the just and reasonable charge . . . and what classification, regulation, or practice is or will be just, fair, and reasonable," *id.* § 205(a).

We first dispense with the idea that Congress clearly intended to limit the practices that can be deemed "unjust or unreasonable," under § 201(b), to those that are contrary to practices prescribed solely under the authority of § 205. To the contrary, it appears to us that Congress has extended the scope of § 201(b) far beyond those core original provisions. Section 201(b) gives the Commission broad power to enact such "rules and regulations as may be necessary in the public interest to carry out the provisions of this Act," *including* sections that were added later by the Telecommunications Act of 1996. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 377-78 & n.5 (1999) (holding that the Commission's rulemaking authority under § 201(b) extends to the implementation of provisions enacted in 1996). And, as we mentioned above, the Commission cited both §§ 201 to 205 *and* § 276 as its authority for enacting the payphone regulations. Given the reach of

---

[6]Although the tariff-filing provisions of the Act have not changed, in 1996 Congress authorized the Commission to stop enforcing the rate-filing requirements, which apparently it has done. *See Ting*, 319 F.3d at 1132 (describing the Commission's decision to "forbear from applying" the tariff filing requirements of 47 U.S.C. § 203, as it was newly authorized to do by 47 U.S.C. § 160(a)). The Commission decided that "market forces [are] sufficient to protect consumers from unjust and unreasonable rates, terms, and conditions" and now requires carriers to establish contracts with consumers. *Id.*

the Commission's rulemaking authority under § 201(b), it would be strange to hold that Congress narrowly limited the Commission's power to deem a practice "unjust or unreasonable." This is especially true now that Congress has given the Commission the authority to waive the tariff-filing requirements, *see supra* note 6, presumably reducing the relevance of the specific procedures provided for in §§ 203 to 205.

[8] Second, although we agree that there are statutory constraints on the Commission's power to deem a practice "unjust and unreasonable," we do not think it clear from the statutory context that Congress intended to limit "practices . . . in connection with . . . communication service," 47 U.S.C. § 201(b), to those that directly involve a carrier's relationship with its customers. Certainly, as the Supreme Court has held in construing closely related statutes, the term "practice" must be interpreted to be consistent with the words around it—that is, it must be a practice connected "with the fixing of rates to be charged and prescribing of service to be rendered." *Mo. Pac. R. Co. v. Norwood*, 283 U.S. 249, 257 (1931); *see also United States v. Pa. R.R. Co.*, 242 U.S. 208, 229 (1916) ("[W]e must rather suppose its association was intended to confine it to acts or conduct having the same purpose as its associates.").[7] But unlike practices involving a carrier's general corporate governance, *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400-02 (D.C. Cir. 2004), or its employment decisions, *Mo. Pac.*, 283 U.S. at 257, the practice of providing compensation to PSPs for payphone service is not clearly unrelated to a carrier's telephone rates and services. As Congress and the Commission have recognized, PSPs must be compensated if customers are to be able to use the

---

[7]The Supreme Court construed the term "practice" as used in the Interstate Commerce Act ("ICA"), from which the Communications Act was derived. *See* S. Rep. No. 781, 73d Cong., 2d Sess. 4 (1934) (detailing the provisions of the ICA from which Congress drew each section of the Communications Act). "[D]ecisions construing the ICA are persuasive in establishing the meaning of the Communications Act." *Conboy v. AT&T Corp.*, 241 F.3d 242, 250 (2d Cir. 2001).

dial-around long distance service that the carrier provides. *See, e.g.*, 47 U.S.C. § 276(b)(1) (ordering the Commission to prescribe regulations "[i]n order to promote competition among [PSPs] and promote the widespread deployment of payphone services to the benefit of the general public"). In short, § 201(b) is ambiguous enough that unjust or unreasonable practices can encompass a broad range of activities related to the services provided and rates charged by a long distance carrier. *Cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 371-72 (1986) (holding that the terms "charges," "classifications," and "practices," as used in section 152(b) of the Communications Act, encompass a company's internal accounting and depreciation practices), *superseded by statute on other grounds as stated in New York v. FCC*, 267 F.3d 91, 101-02 (2d Cir. 2001). The activity deemed unjust and unreasonable here does not cross the line.

Finally, we consider whether Congress, in § 276 itself, expressed a clear intent to make private actions to recover payphone compensation unavailable under any provision of the Act. We conclude that it did not. It may be that § 276 does not itself oblige carriers to pay PSPs, as we held in *Greene*, 340 F.3d at 1050-51, but nothing in the text of § 276 suggests that Congress intended to prevent the obligations that *other* statutes impose on carriers from being enforced as part of the system of payphone regulation that it ordered the Commission to design. This is not a situation in which a more general statute, § 201(b), has been interpreted to create a private right of action where a more specific section, § 276, has been interpreted not to create one. *Cf. Santiago Salgado v. Garcia*, 384 F.3d 769, 774 (9th Cir. 2004) (noting the "elementary tenet of statutory construction that where there is no clear indication otherwise, a specific statute will not be controlled or nullified by a general one" (internal quotation marks omitted)), *cert. denied*, 125 S. Ct. 1670 (2005). That is, although § 276 more specifically addresses the subject of payphone regulation, it does not impose any obligations on carriers—and, perhaps more importantly, does not relieve them of any obligations.

On the subject of a common carrier's obligations, § 276 is silent and cannot be considered more specific than § 201(b).

**[9]** In sum, we conclude that nothing in the statute clearly precludes the construction offered by the Commission. Next, we must determine whether that construction was a "reasonable policy choice" or, instead, was "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 845, 844.

Defendant argues that the Commission's interpretation is unreasonable because it would convert § 201(b) into a "catch-all provision equating violations of Commission regulations with statutory violations." But, as the Supreme Court said in *Brand X*, "[w]e need not decide whether a construction that resulted in these consequences would be unreasonable because we do not believe that these results follow from the construction the Commission adopted." 125 S. Ct. at 2708. In other words, the Commission did *not* conclude that every violation of its regulations is an "unjust and unreasonable" practice, nor does its interpretation necessarily mean that a violation of any other regulation is an "unjust and unreasonable practice." Instead, the Commission identified as "unjust and unreasonable" a single practice, and we must determine whether the agency acted reasonably with respect to that practice.

We think that it did. Without repeating our discussion above, we reiterate that we have no reason to think that the FCC acted unreasonably when it deemed the failure to pay compensation to PSPs to be a "practice[ ]" in connection with "communication service." The Commission has "invoked § 201(b) in several contexts" to which the Commission's authority to prescribe just and reasonable charges and practices under § 205 "does not pertain" and which do not pertain directly to a carrier-customer relationship. *APCC Servs., Inc. v. Sprint Commc'ns Co.*, No. 04-7034, 2005 WL 1512837, at *15 (D.C. Cir. June 28, 2005) (per curiam) (Ginsburg, J., dis-

senting in part and from the judgment) (citing *Ascom Commc'ns, Inc. v. Sprint Commc'ns Co.*, 15 F.C.C.R. 3223, 3227 (2000) (addressing a carrier's attempts to collect payments from a PSP for certain payphone calls); *Tel. No. Portability*, 18 F.C.C.R. 23697, 23709 n.76 (2003) (addressing the FCC's telephone number portability rules); and *Core Commc'ns, Inc. v. SBC Commc'ns Inc.*, 18 F.C.C.R. 7568, 7578, ¶ 25 (2003) (addressing a carrier's failure to comply with merger conditions)). We are "hard-pressed" to say that the FCC acted unreasonably in determining what is "unjust and unreasonable" under § 201(b). *Id.*

**[10]** Moreover, as we discussed above, the Commission did not unreasonably interpret Congress' intent in enacting § 276. It is apparent from the *2003 Payphone Order* that allowing for private actions to recover payphone compensation is an integral part of the regulatory system that Congress ordered the Commission to design. As the Commission further explains in its amicus brief, foreclosing private actions under federal law "would appear to deny payphone providers a damages remedy *anywhere*," including before the Commission. That is because the statutory basis for relief is the same in either forum: Section 206 makes common carriers liable in damages for violations of "this chapter" and § 207 gives injured persons a choice of federal fora to recover those damages—the person either may "make complaint to the Commission" *or* "may bring suit for the recovery of the damages . . . in any district court of the United States of competent jurisdiction." As the Commission explains:

> In the absence of a damages remedy under §§ 206-208, the Commission still might impose penalties for violations of its rules under 47 U.S.C. § 502, but such payments would go to the United States Treasury, not to compensate payphone providers. Such sanctions would fail to fulfill the mandate of § 276(b)(1)(A) that "all payphone service providers

> are fairly compensated for each and every completed intrastate and interstate call."

It is, at the very least, reasonable for the FCC to conclude that Congress would not have intended to grant PSPs an entitlement to compensation and to give the Commission broad authority to establish a mechanism to provide that compensation, but simultaneously to limit the enforcement of the statute and implementing regulations to the imposition of civil penalties. Thus, even if it is true, as we held in *Greene*, that Congress did not create a cause of action in § 276, the Commission reasonably interpreted § 201(b) to fill the gap.

Of course, our decision in *Greene* relied on policy considerations that would favor the opposite conclusion. *See, e.g.*, *Greene*, 340 F.3d at 1053 ("To imply a private right of action runs counter to this centralization of function and to the development of a coherent national communications policy."). But, as the Supreme Court recently reiterated, resolving statutory ambiguities "involves difficult policy choices that agencies are better equipped to make than courts." *Brand X*, 125 S. Ct. at 2699 (citing *Chevron*, 467 U.S. at 865-66). In that spirit, we defer to the Commission's reasonable, authoritative interpretation of § 201(b) and hold that a private action is available to remedy the unjust and unreasonable practice of failing to pay PSPs according to the Commission's regulations.[8] Therefore, we affirm the district court's decision to grant Plaintiff leave to amend its complaint to include a claim under that section. However, as we explain below, we reverse the court's decision to allow Plaintiff to add a claim under § 416(c).

---

[8]Our decision is consistent with *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001), where the Court stated: "A Congress that intends the statute to be enforced through a private cause of action intends the *authoritative interpretation of the statute* to be so enforced as well." (Emphasis added.)

3. *The Commission's interpretation of § 416(c) is not entitled to deference.*

The Commission joins Plaintiff in arguing that a carrier's obligation to compensate PSPs is enforceable as a violation of 47 U.S.C. § 416(c), a provision of the Communication Act's "Procedural and Administrative" subchapter, which states:

> It shall be the duty of every person . . . to observe and comply with . . . orders [of the Commission] so long as the same shall remain in effect.

Plaintiff and the Commission assert that a failure to comply with the payphone regulations is a violation of § 416(c) and is therefore actionable under §§ 206 and 207.[9]

[11] We have interpreted the term "order," in 47 U.S.C. § 401(b), to encompass rulemaking orders and regulations as well as adjudicative orders. *Hawaiian Tel. Co. v. Pub. Utils. Comm'n*, 827 F.2d 1264, 1270-72 (9th Cir. 1987). In view of that controlling precedent, we find no fault with the Commission's opinion that the payphone regulations are "orders" within the meaning of § 416(c). Nonetheless, we conclude that the Commission's interpretation of § 416(c) is unreasonable because it would make *every* pronouncement of the Commission automatically enforceable in a private action, contrary to the intent of Congress. It is technically true that § 416(c) makes a violation of any "order" of the Commission

---

[9]Unlike the Commission's interpretation of § 201(b), this interpretation of § 416(c) is not found in any FCC order and comes only from the agency's amicus briefs. We need not address whether or how the format of the Commission's interpretation affects the level of deference we afford it, because we conclude that the Commission's interpretation of § 416(c) is contrary to the clear intent of Congress. *See Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003) (en banc) (determining first whether an agency interpretation is contrary to the clear intent of Congress and, only if it is not, reaching the question whether that interpretation carries the "force of law").

a violation of the statute itself and, thus, according to the Commission, would give rise to an action under §§ 206 and 207. But to hold that §§ 206 and 207 encompass all violations of § 416(c) would render superfluous the requirement that an action under § 206 allege a violation of a *statute*. *Cf. Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005) ("We try to avoid, where possible, an interpretation of a statute that renders any part of it superfluous and does not give effect to all of the words used by Congress." (internal quotation marks omitted)). And, because nothing (or, perhaps, everything) is prohibited by the text of § 416(c), adopting this construction would create, automatically, a private action for violation of any "order." By contrast, under § 201(b), the Commission must conclude that a practice is reasonably related to rates and services and is substantively "unjust or unreasonable" before a private action can exist.

In sum, we interpret the text of § 206 to mean that Congress did not intend for every violation of a regulation to give rise to a private action for damages. The Commission's interpretation of §§ 206, 207, and 416(c) is plainly contrary to that intent. Therefore, that interpretation is due no deference, and we reverse the district court's decision to grant Plaintiff leave to add a claim under § 416(c).

On the second question presented in this appeal, whether Plaintiff's state law claims are preempted, the Commission takes no position. We now turn to that question.

B.  *Plaintiff's state law claims for breach of implied contract and "quantum meruit" are not preempted.*

[12] "The purpose of Congress is the ultimate touchstone" in any preemption analysis, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks omitted), so we look first and foremost to Congress' express statement of its intent:

To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall pre-empt such State requirements.

47 U.S.C. § 276(c); *see also CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (stating that the plain wording of an "express pre-emption clause . . . necessarily contains the best evidence of Congress' pre-emptive intent"). The presence of an express preemption provision supports an inference that Congress did not intend to preempt matters *beyond* the reach of that provision. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995) (citing *Cipollone*, 505 U.S. at 517). But an express provision does not categorically preclude courts from applying principles of implied preemption. *Id.* at 288-89. Moreover, "even when Congress declares its preemptive intent in express language, deciding exactly *what* it meant to preempt often resembles an exercise in implied preemption analysis." 1 Laurence H. Tribe, American Constitutional Law § 6-28, at 1177 (3d ed. 2000). Thus, despite our primary focus on the text of § 276(c), it bears mentioning that the Supreme Court has

recognized at least *two types of implied pre-emption*: *field pre-emption*, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and *conflict pre-emption*, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (citations and internal quotation marks omitted) (emphasis added).

Field preemption is absent here. It is true that § 276 substantially expands the Commission's jurisdiction and gives it

broad authority to regulate both intrastate and interstate pay-phone calls. *See, e.g.*, *Ill. Pub. Telecomms. Ass'n*, 117 F.3d at 561-62 (holding that the Commission may regulate rates for local coin calls). Yet, by expressly limiting federal preemption to state requirements that are *inconsistent* with the federal regulations, Congress signaled its intent not to occupy the entire field of payphone regulation. *See Ishikawa v. Delta Airlines, Inc.*, 343 F.3d 1129, 1133 (9th Cir.), *amended by* 350 F.3d 915 (9th Cir. 2003) ("[T]he 'express provisions for preemption of some state laws,' the inconsistent ones, 'imply that Congress intentionally did not preempt state law generally.' " (quoting *Keams v. Tempe Technical Inst., Inc.*, 39 F.3d 222, 225 (9th Cir. 1994))); *Total TV v. Palmer Commc'ns, Inc.*, 69 F.3d 298, 303 (9th Cir. 1995) (holding that a provision preempting inconsistent state laws was "simply a recognition that Congress did not intend to fully occupy the field"). Our conclusion is reinforced by the Communication Act's savings clause: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute . . . ." 47 U.S.C. § 414.[10]

**[13]** Principles of implied *conflict* preemption, however, are relevant to our analysis, at least insofar as they help us interpret the scope of the express preemption provision. In fact, our analysis of whether state requirements are "inconsistent" with the federal regulations within the meaning of § 276(c) is substantially identical to the analysis of implied conflict preemption: whether "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Gade*, 505 U.S. at 98 (internal quotation marks omitted), or, as is more relevant in applying § 276(c), the purposes and objectives of the Commission.[11]

---

[10]We also have held that federal regulation of telecommunications, in general, does not completely preempt state law. *Ting*, 319 F.3d at 1136-37; *see id.* at 1137 ("Detariffing has created a much larger role for state law and this fact is sufficient to preclude a finding that Congress intended completely to occupy the field, following the 1996 Act.").

[11]Only state requirements inconsistent with the *Commission's regulations* are preempted. 47 U.S.C. § 276(c). That fact does not absolutely pre-

Under both implied conflict preemption and our interpretation of § 276(c), state law is preempted "to the extent it actually interferes with the methods by which the federal [regulatory scheme] was designed to reach its goal." *Ting*, 319 F.3d at 1137 (internal quotation marks omitted).

Our task, then, is to discern the "full purposes and objectives" of the Commission's regulations and to determine whether Plaintiff's state law claims interfere, or are otherwise inconsistent, with them.

  1.  *The payphone regulations set defaults, but generally do not mandate uniformity.*

The Commission's regulatory system addresses three principal issues: (1) who must pay for which calls; (2) how much must they pay; (3) and what procedures must be followed in making payment. *See generally* 47 C.F.R. § 64.1300-.1340. On the latter two issues, at least, the Commission's rules are not inflexible prescriptions. In keeping with the Commission's trend toward market-based regulation, the rules allow carriers and PSPs to set alternative compensation amounts and payment methods by contract.

---

clude us from identifying a broader scope of implied preemption within § 276, but we see no cause for doing so here. Although we discern in § 276 a clear intent to create a comprehensive federal plan for payphone regulation, Congress left it to the Commission to decide how to structure the regulations and enforcement mechanisms. Congress did not express a preference for absolute national uniformity or exclusive federal enforcement, leaving those decisions to the Commission and expressly allowing for the operation of state law if consistent with the Commission's chosen plan. *Cf. CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 675 (1993) (holding that an express provision preempting all state laws "*relating to* railroad safety" was broad and would preempt state claims that cover the same subject matter) (emphasis added). Thus, in keeping with Congress' expressed intent, we will focus primarily on the purposes and objectives of the Commission's regulations.

On the first issue—who must pay—the Commission has changed course several times but now has fixed a definite rule, as we discussed above. The rules distinctly assign liability for payment to particular classes of carriers, *see* 47 C.F.R. § 64.1300, and the Commission has sought to ensure that parties are not permitted, in negotiations over payment arrangements, to shift the effective liability for payment to other carriers. *See* The Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, 70 Fed. Reg. 720, 721, ¶ 11 (Jan. 5, 2005) ("*2005 Reconsideration Order*") ("For instance, demands by PSPs that an [alternative compensation arrangement] contain a provision that forces [interexchange carriers] to assume ultimate responsibility for the payphone compensation obligations of [switch-based resellers] would undermine the Commission's determination in the [*2003 Payphone Order*] that [interexchange carriers] are not liable for such payphone compensation.").

By contrast, the rules expressly allow carriers and PSPs to negotiate compensation amounts and payment methods that differ from the defaults set by the Commission. In 47 C.F.R. § 64.1300(b), carriers are directed to compensate PSPs on a per-call basis "at a rate agreed upon by the parties by contract"; only in the next subsections does the rule establish default per-call rates to be paid "[i]n the absence of an agreement." 47 C.F.R. § 64.1300(c), (d); *see also id.* § 64.1301(a) (setting various default rates "[i]n the absence of a negotiated agreement to pay a different amount"). Similarly, the rules lay out detailed reporting and payment procedures—which are intended to give PSPs the information they need to determine which carrier completed, and therefore was responsible for paying for, each call made from their payphones—but nonetheless allow parties to waive those procedures by agreeing to "alternative compensation arrangement[s]." *Id.* § 64.1310(a).[12]

---

[12]The Commission has asserted some control over this contracting relationship. In January 2005, the Commission amended its rule to provide

In short, the payphone regulations fix liability for payment upon particular carriers, but allow the parties to negotiate about the details of that payment. *See Fair v. Sprint Payphone Servs., Inc.*, 148 F. Supp. 2d 622, 626 (D.S.C. 2001) ("[T]he FCC has left it to the parties to determine by contract the rates at which payphone service providers are to be compensated."). In the absence of an agreement, the regulations set a defined price and payment procedure.

**[14]** The Commission's reliance on market-based rate-setting mechanisms is part of a broader trend in telecommunications regulation—a trend that has opened up more space for the operation of state law. For example, in the 1996 Act, Congress authorized the Commission to eliminate its longstanding requirement that telecommunications carriers file their rates, terms, and conditions with the FCC. *Ting*, 319 F.3d at 1130-32. Now, carriers generally establish contracts with consumers to govern rates, terms, and conditions, and the Commission relies principally on market competition to produce the "just and reasonable" rates required by 47 U.S.C. § 201. *Id.* at 1132. As we said in *Ting*:

> Unlike rate filing, this market-based method depends in part on state law for the protection of consumers in the deregulated and competitive marketplace. This dependence creates a compl[e]mentary role between federal and state law under the 1996 Act.

*Id.* at 1141. In this environment, we cannot simply hold that all state law claims, in general, are inconsistent with federal regulation of telecommunications, especially where the pay-

---

that a PSP "may not unreasonably withhold its consent to an alternative compensation arrangement." *2005 Reconsideration Order*, 70 Fed. Reg. at 723. Along with this amendment, the Commission published an order providing "guidance on the types of contracts that it would deem to be reasonable methods of compensating PSPs." *Id.* at 720.

phone regulations are silent as to the method of enforcement and the role of state law. Therefore, we must look carefully at Plaintiff's state law claims to determine whether they complement, or are inconsistent with, the federal payphone regulations.

2. *Plaintiff's state law claims may go forward to the extent that they are not inconsistent with federal regulations.*

As an initial matter, we note that a provision expressly preempting certain state "requirements," like § 276(c), can "reach[ ] beyond positive enactments, such as statutes and regulations, to embrace common-law duties." *Bates v. Dow Agroscis. LLC*, 125 S. Ct. 1788, 1798 (2005). To determine whether Plaintiff's state law claims are preempted, we must consider the theory of each claim and determine "whether the legal duty that is the predicate" of that claim is inconsistent with the federal regulations. *Cipollone*, 505 U.S. at 523-24; *see also Ishikawa*, 343 F.3d at 1132 ("[W]e cannot see how *the duty the state common law imposed* . . . could be inconsistent with the federal guidelines, which require the same thing with more specificity." (emphasis added)). Even when a state law requirement must be equivalent to a federal regulation to survive preemption, it is not necessary at the pleading stage that the state requirement "be phrased in the *identical* language as its corresponding [federal] requirement." *Bates*, 125 S. Ct. at 1804; *see also id.* (noting that, at the trial stage, the court's jury instructions can ensure that the state claim does not exceed its proper scope).

Plaintiff's amended complaint asserts three claims for violation of state law: quantum meruit (or "unjust enrichment," as this claim was labeled in Plaintiff's amended complaint), breach of implied contract, and negligence. We look to Washington law and to the allegations in Plaintiff's complaint to flesh out the legal duty that Plaintiff seeks to enforce.[13] So far

---

[13]In so doing, we make no comment as to the merits of any of Plaintiff's claims. Defendant has not argued, thus far in the litigation, that any of those claims fails to state a claim under Washington law.

as is apparent from the pleadings, Plaintiff's "implied contract" and "quantum meruit" or "unjust enrichment" claims correspond to the two types of implied contracts recognized under Washington law: contracts implied in fact and contracts implied in law, respectively.

### a.  *Contract Implied in Fact*

A contract implied in fact is like an express contract except that it arises not from the parties' words, but instead from actions or circumstances that demonstrate a mutual intention to enter into a contract. *See Heaton v. Imus*, 608 P.2d 631, 632 (Wash. 1980) ("A contract implied in fact is an agreement of the parties arrived at from their conduct rather than their expressions of assent."); *Eaton v. Engelcke Mfg., Inc.*, 681 P.2d 1312, 1314 (Wash. Ct. App. 1984) ("A true implied contract, or contract implied in fact, does not describe a legal relationship which differs from an express contract: only the mode of proof is different."). "[T]he legal relationship formed does not differ whether the contract is expressed or implied in fact." 25 Wash. Prac., Contract Law and Practice § 1.16 (West 1998).

In its claim for breach of "implied contract," Plaintiff characterizes the interaction between itself and Defendant as conduct evidencing a mutual intention to enter into a contract. Plaintiff's theory is that, by making its payphones available to the general public, Plaintiff impliedly offered them for the use of Defendant's customers at the rates established by the FCC. Then, "[b]y accepting, transporting, and completing calls made from Plaintiff's payphones by Defendant['s] customers, Defendant[ ] impliedly accepted Plaintiff's offer of service," forming a contract for payphone compensation in the exact amount set by the FCC.

**[15]** This claim, insofar as it is premised on the existence of a contract between the parties, cannot be preempted by § 276(c). The Commission's regulations contemplate that

PSPs and carriers, in some circumstances, will agree to contracts for payphone compensation with terms that differ from those contained in the regulations. *See* discussion *supra* Part III.B.1, pp. 12770-72. In those circumstances, state contract law, not the federal regulations, would govern the resolution of contract-related questions, such as whether a contract was formed, what terms the parties agreed to, and whether the contract was breached. *See, e.g.*, *Fair*, 148 F. Supp. 2d at 626 ("While federal regulations authorize the existence of payphone compensation contracts, whether the specific agreements at issue in the present case are illegal will be determined by state law."). As in the context of ratemaking, where private contracts have replaced rigid rate prescriptions, state contract laws provide a background that is not only consistent with, but is integral to, the market-based mechanism of the federal regulations. *See Ting*, 319 F.3d at 1146 (holding that state consumer protection laws do not conflict with 47 U.S.C. §§ 201 and 202).

The state law claim is even stronger when the implied agreement is to pay what the FCC requires. Seeking such payments cannot, by definition, be inconsistent with what the FCC requires.

### b.    *Contract Implied in Law*

The preemption question becomes more complicated where the premise of the claim is not an agreement between the parties, but an equitable duty to pay. A contract implied in law is not technically a contract at all, but is a "non-contractual obligation that is treated procedurally as if it were a contract." 25 Wash. Prac., Contract Law and Practice § 1.16. The obligation to pay is imposed by law, not by the defendant's agreement to enter into a contract; it is imposed to prevent the defendant from being unjustly enriched by services provided in the absence of a contract for which the plaintiff deserves, and expected, payment. *Id.* The plaintiff recovers in "quantum meruit," which is the court's determination of the reasonable

value of the services provided. *See Heaton*, 608 P.2d at 632-33 (describing the doctrine of "quasi contract").

In fashioning quantum meruit relief, the court—like the federal payphone regulations—would be setting a default value for the services that Plaintiff provided. Plainly, an award of quantum meruit that assigned a different default value for payphone calls would be inconsistent with the federal regulations and therefore preempted. Recognizing this potential problem, Defendant argues that Plaintiff's quasi-contract claim is preempted because a court *could* assign not only a different rate of compensation, but also "payment for calls that are not compensable and assignment of liability to the wrong entity."

But it is not clear that the mere possibility of an inconsistent award should preempt Plaintiff's claim as it was pleaded in the original complaint. In its original complaint, Plaintiff explicitly assigned a value of 24 cents per call to those uncompensated services—the same value assigned by the federal regulation, 47 C.F.R. § 64.1300(d). In its amended complaint, Plaintiff reworded the claim to seek "the reasonable value of the economic benefits conferred on Defendant[ ]," but Plaintiff represented in its brief and at argument before this court that it would be seeking, under state law, exactly the same rate of compensation for the same calls as it would be entitled to receive under the federal regulations. Moreover, as did the court in *Precision Pay Phones v. Qwest Communications Corp.*, the district court here assumed that 47 C.F.R. § 64.1300 would control the valuation of the services in the quantum meruit claim. *See* 210 F. Supp. 2d 1106, 1118 (N.D. Cal. 2002) (stating that, "*[h]ad the FCC regulation not set a default rate*, Plaintiff would be free to prove under state law the value of the service" (emphasis added)), *disapproved on other grounds by Greene*, 340 F.3d at 1051 n.4. In fact, in distinguishing its own quasi-contract counterclaim, even Defendant has suggested that a claim is not preempted if it "relies *exclusively* on the existence of the FCC's regulations." Insofar

as Plaintiff's claim relies exclusively on the regulations, we cannot say that it is "inconsistent" with the federal regulations. *See Bates*, 125 S. Ct. at 1804 (noting that district can instruct the jury on the relevant federal standards in order to ensure that the state claim remains consistent with federal regulations).

A "hypothetical conflict is not a sufficient basis for preemption." *Total TV*, 69 F.3d at 304; *see also Ishikawa*, 343 F.3d at 1132 ("LabOne argues . . . that state tort law *could* be inconsistent with federal regulations. LabOne, however, makes no attempt to show that anything about the state law applied in this case actually *was* inconsistent. . . . The district court invited and the plaintiff urged that the jury use the federal requirements to evaluate whether LabOne performed its duties with due care."). As in those cases, the mere possibility of inconsistent remedies is insufficient to require preemption of all quasi-contract or "implied in law" claims.

Our answer would be different if § 276(c) gave the Commission *exclusive* authority to regulate rates or other terms of payphone compensation, making preemption complete. Indeed, in situations of complete preemption it has been suggested that claims for recovery in quantum meruit would be preempted from the outset. For example, a statute providing that "no State or local government shall have any authority to regulate . . . the rates charged by" cellular telephone providers, 47 U.S.C. 332(c)(3)(A), has been held to preempt any claim that would require a court to set a reasonable rate or to assess the reasonableness of rates charged. *Fedor v. Cingular Wireless Corp.*, 355 F.3d 1069, 1073-74 (7th Cir. 2004) (citing *In re Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. 17,021, 17,035 (Aug. 14, 2000)); *see also AT&T Corp. v. FCC*, 349 F.3d 692, 701 (D.C. Cir. 2003) (noting that the FCC had "strongly suggest[ed] that a claim based on *quantum meruit* would be preempted" by § 332(c)(3)(A) (citing *Petitions of Sprint PCS & AT&T Corp. for Declaratory Ruling Regarding CMRS Access Charges*, 17 F.C.C.R. 13,192,

13,198 n.40 (2002)). Similarly, we have held that, because the Federal Energy Regulatory Commission has "exclusive authority to determine the reasonableness of wholesale rates," a plaintiff's claim was preempted insofar as it "require[d] the district court, at some point, to determine the fair price of the electricity that was delivered under the contract." *Pub. Util. Dist. No. 1 v. IDACORP Inc.*, 379 F.3d 641, 647-48 (9th Cir. 2004).

**[16]** Those cases differed from the present case in that regulation of rates by state and local entities was absolutely barred. Here, by contrast, only "inconsistent" state requirements are barred. As stated originally, Plaintiff's quasi-contract claim sought recovery for unjust enrichment in the exact amount that it was entitled to be paid under the federal regulations and, consequently, would not require the district court to determine a reasonable price, let alone to set an "inconsistent" price. Thus, we affirm the district court's decision to deny judgment on the pleadings on this claim.

###    c.    *Negligence*

A negligence claim, in Washington, requires proof of a duty, a breach of duty, a resulting injury, and proximate cause between the breach and the injury. *Hutchins v. 1001 Fourth Ave. Assocs.*, 802 P.2d 1360, 1362 (Wash. 1991). Here, Plaintiff seeks to enforce Defendant's duty, created by "applicable orders and regulations" of the Commission, to track calls placed from Plaintiff's payphones and to provide the tracking information to Plaintiff in order to help it pursue collection from other responsible carriers. *See, e.g.*, 47 C.F.R. § 64.1310(c)(1) (requiring each "Intermediate Carrier" to provide quarterly reports containing particular information about "all the facilities-based long distance carriers to which the Intermediate Carrier switched toll-free and access code calls dialed from each of that payphone service provider's payphones").

For breach of that duty, Plaintiff seeks to recover all damages caused by its inability, in the absence of the necessary tracking information, to pursue collection from other carriers. Granting Plaintiff's requested relief would make Defendant financially liable for calls other than those for which the regulations make it responsible. In this circumstance, we agree with Defendant that Plaintiff's negligence claim is preempted.

**[17]** In enacting the payphone regulations, the Commission's primary purpose was to create a system for compensation. *See* 47 U.S.C. § 276(b)(1)(A) (directing the Commission to adopt a "compensation plan"). As we stated above, a primary objective—and a primary difficulty—for the Commission has been to settle confusion over which carrier is responsible for payment when more than one carrier handles a call. *See 2003 Payphone Order*, 18 F.C.C.R. at 19,976, ¶ 2 ("These rules satisfy section 276 by identifying the party liable for compensation and establishing a mechanism for PSPs to be paid."); *APCC Servs.*, 20 F.C.C.R. 2084, ¶ 25 (refusing to accept an argument that "conflicts with the Commission's reasoned decision to place responsibility on facilities-based carriers only"). Here, imposing a duty that may make carriers liable for calls for which other carriers are responsible would be inconsistent with the Commission's careful assignment of liability.

**[18]** We do not hold that state law remedies—for example, damages for breach of an express contract relating to payphone services—would be preempted simply because they provide recovery in amounts more than the contractual or default per-call amount. *See Bates*, 125 S. Ct. at 1800-01 (holding that an additional remedy does not constitute an additional "requirement"). Here, however, where Plaintiff seeks to impose liability under state law by shifting to Defendant the payment obligations of a carrier other than Defendant, we hold that its claim is inconsistent with the federal system and therefore preempted by § 276(c). We accordingly

reverse the district court's decision to grant Plaintiff leave to amend its complaint to add a negligence claim.

### 3. *Conclusion*

The Commission's regulations reveal an intent to create predictability in payphone compensation, but they do not require uniformity at the level that Defendant asserts, at least with respect to rates and methods of payment. The regulations contemplate that parties will enter into mutually acceptable agreements that automatically override the Commission's prescriptions, and state contract law must have a role in regulating those agreements. Nothing in § 276 or the Commission's regulations precludes state common law actions to enforce obligations identical to those set forth in the Commission's regulations. Because, as the Commission states in its amicus brief, claims for compensation "involve largely factual questions" and any policy issues that do arise can be referred to the Commission under the doctrine of primary jurisdiction, we see little danger of inconsistent administration of federal policy. *See Precision Pay Phones*, 210 F. Supp. 2d at 1119 ("The federal ingredient involved here—the setting of the per call dial-around rate in the absence of a contract—requires no interpretation of federal law. Hence, there is no compelling need for a federal forum to *e.g.* facilitate national uniformity in the interpretation or application of federal law." (footnote omitted)).

Therefore, we affirm the district court's decision to deny judgment on the pleadings as to Plaintiff's claim for quantum meruit. We also affirm the court's decision to allow Plaintiff to add a claim for breach of contract implied in fact, but we reverse the decision as to Plaintiff's negligence claim, which seeks to impose liability in a manner inconsistent with the federal payphone regulations.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.